GALVESTON, H. & S. A. RY. CO. v.
MUHLEMANN. (No. 5573.)

(Court of Civil Appeals of Texas. San Antonio.
Jan. 10, 1916. Rehearing Denied
Feb. 9, 1916.)

1. MASTER AND SERVANT �kö=278—INJURIES TO
SERVANT—LIABILITY OF MASTER—EVIDENCE
—SUFFICIENCY.

Evidence *held* insufficient to show liability
of a railway company for injuries to a car in-
spector received when inspecting a locomotive
on a turntable, when the turntable was moved
without warning, in spite of the custom to give
warning when the turntable operator could see
that any one was about the engine, where the
evidence also showed that the injured servant
could not have been seen had the operator
looked.

[Ed. Note.—For other cases, see Master and
Servant, Cent. Dig. §§ 954, 956–958, 960–969,
971, 972, 977; Dec. Dig. ⊦=278.]

2. MASTER AND SERVANT ⊦=293—INJURIES TO
SERVANT—LIABILITY OF MASTER—ACTIONS—
INSTRUCTIONS.

Where a car inspector was injured while in-
specting a locomotive on a turntable which was
moved without warning in spite of custom to
give warning if any one could be seen about
the engine, it was error to refuse to instruct
that the employé could not recover if, had the
turntable operator looked, he could not have
seen the employé.

[Ed. Note.—For other cases, see Master and
Servant, Cent. Dig. §§ 1148–1156, 1158–1160;
Dec. Dig. ⊦=293.]

Appeal from District Court, Bexar Coun-
ty; R. B. Minor, Judge.

Action by Fred Muhlemann against the
Galveston, Harrisburg & San Antonio Rail-
way Company. From a judgment for plain-
tiff, defendant appeals. Reversed and re-
manded.

Baker, Botts, Parker & Garwood, of Hous-
ton, and Templeton, Brooks, Napier & Og-
den and Ed W. Smith, all of San Antonio,
for appellant. Engelking & James, of San
Antonio, for appellee.

MOURSUND, J. This is an appeal from a
judgment for $4,500 on account of injuries
to appellee's foot sustained on April 21, 1913,
while he was in appellant's employ in the
capacity of engine inspector. Appellee al-
leged that he was at the time inspecting an
engine on appellant's turntable near its
roundhouse in San Antonio, and was under
the end of the tender at the edge of the
turntable; that the employés in charge of
the turntable knew, or by the exercise of due
diligence were bound to know, of his situa-
tion; that while he was so situated the table
was turned without notice or warning to
him; that it was the custom not to turn the
table without giving such notice or warning;
that when the table was turned his foot was
caught and injured. The material allega-
tions of the petition were traversed by de-
fendant, and the existence of the alleged cus-
tom specially denied. The facts were pleaded
with great particularity, it being averred
(among other things) that it was not plain-
tiff's duty to inspect engines on the turn-
table; that it was his duty to govern his
work and movements by the work and move-
ments of those operating the table; that the
table was liable to be turned at any time
without notice, and plaintiff knew that fact;
that he could have easily protected himself
against injury incident to the turning of the
table without notice.

Appellee was an engine inspector. Scott
was engine "hostler," whose duty it was to
take engines upon the turntable and thence
into the roundhouse. He had a helper by
the name of Smith. Appellee testified: That
when he got to the engine neither Scott nor
Smith was there. That he had not seen them
up to that time, and did not know who put
the engine on the turntable. When he looked
out of the roundhouse and saw the Katy en-
gine on the turntable, he said: "Here's a
strange Katy. I am going out to inspect
her." That he was "suspicious" that she
would be turned and get out right away.
The engine was headed west and was long
enough to nearly cover the turntable. The
end of her tender was within a few feet of
the edge of the turntable. He went to the
north side and then came around on the
south side; inspected the cab; then the ten-
der; then inspected the head of the engine;
then went along the south side inspecting the
south side of the engine and tender until he
got to the rear of the tender and the east
end; during all of which time he did not see
Scott or Smith, or any one else, around there.
He went around to the east side of the tender
and near the east edge of the turntable,
where it joined the pit wall. He took the
height of the coupler, and then inspected the
coupler springs and coupler. He testified
that in order to do this "he had to stoop
down under the end of the tender and go
right under." Up to this time he had not
seen anybody about the engine at all. Just
before he started to go under the tender he
stepped around the corner and looked to see
if there was any one in the motor house. He
testified:

"That is the custom. If there was a man in
the power house I would not have gone under,
and it was his time to look after I went under."

He knew the engine might be moved in a
minute; but that the employé moving it must
look out from the power house before mov-
ing it. His testimony as to what occurred
next, as given in his direct examination, is
as follows:

"I went under her and inspected the back
coupler, and I went underneath like this (in-
dicating), and I was away under and looked up
under the frame (indicating by lying down). I
saw the coupler was all right, and I came out.
As I turned to get out, my foot got catched be-
tween the rails. The turntable was running,
and it took my foot down between the table, and
while the engine was right even with the edge it
threw me on the edge, and I put my arm this
way (indicating) on the coupler and kept pulling
on my foot, and my foot went down."

On cross-examination he testified further: "I could see the power house from where I was under the coupler when I went under. Then after I turned I looked up and saw the coupler, I didn't look at the house any more, I went to inspecting. When I stooped under the tender, I looked up under the tank towards the power house to see if I could see the power house, and I could see the power house, and there was nobody in there. I looked to see about that, because it was my duty. I was under there about a minute. I don't remember what I testified to on the other trial, but it may have been less than a half a minute or more than half a minute that I was under there. A man at the power house could see under the tender and see a man at the back end of the tender. When the turntable started, I was just getting out from under the engine. Just as the turntable got started, I was on the turntable. The moment I got up, I was like this (indicating by leaning in a slanting position), and that foot was back there (indicating). I straightened; the table caught my foot at the same time it started. When the table started, I had both my feet on the table, and when the table moved around in some way my left foot caught, and the table went about two stalls, about twelve feet, something like that, before I got my foot out. My entire foot was down between the edge of the turntable and the pit wall, down to the ankle. The toes were backward towards the east and the heel towards the west. I had inspected the front end and the south side of the engine and had inspected the east end before the accident happened. The north side was still to be inspected, and after the accident happened I inspected the north side, then I went around to where my helper, Brown, was, and told him I had gotten hurt."

He testified he afterwards saw Scott; that he came out of the power house and went along the north side of the engine and came around the head of the engine, and appellee met him on the back of the tender; that he came back there to see if the track was all lined up, and that appellee said: "Scott, you have got me," to which he replied:

"I can't help it, you know I wouldn't hurt you, but I haven't got no helper this morning, and I haven't got time to look around."

Scott denied that any such conversation took place.

Appellee's version of the custom pleaded by him is as follows:

"It is always the rule for the man who is moving the turntable to look out before moving it, and if he sees anything or anybody at work on the turntable he would call out or holler at you before moving it. That was the rule. There was standing orders same as an engineer when he moves an engine either to blow the whistle or ring a bell. When the operator gets ready to move the table, he always looks out, and if he saw me or any one on the table he would call out or holler at me. He would holler: 'Look out there! Get off of there! I am going to move the table.' He would look out, and if he saw me or any one on the table he would holler at me that way. Whoever operated the table was to look out before they started the table, give a warning to get out. When the table is safe, then he would move the table, and if he saw no one he would naturally not holler."

The motor house is situated about 4 or 5 feet from the track on the turntable and about the same distance from the edge of the table. It is about four feet square. The lower part is formed by a wooden frame with a door next to the track. The upper part is formed by glass windows the size of the house. In order to move the turntable, the employé steps into the motor house and pulls a lever, which causes the turntable to be moved. It is impossible for any one on the turntable to be injured by moving the same unless he gets some part of his person between the edge of it and the pit wall, there being an opening, estimated by appellant at from 2½ to 3 inches, and by Cavanaugh, who measured it, at from ¾ of an inch to an inch. The head of the engine was towards the motor house. It was about 75 or 80 feet across the turntable. There was no rule requiring any signal to be given when the turntable was moved. The testimony supports a finding that it was customary for inspectors to sometimes inspect engines while on the turntable. Appellant had the same engine run onto the turntable and experiments made by three disinterested witnesses for the purpose of ascertaining whether a person in appellee's position, as testified to by him, could be seen from the motor house. One of these, Lehr, testified that on account of the angle, the tank and trucks, in fact all the lower part, obstructed the view so that he could not, from any part of the motor house, see back of the tender; that a person would have to leave the motor house and walk around the engine to see whether there is any one behind the tender at the edge of the turntable. It is true that Horan, one of the three, placed himself a little further back than appellee was. They all testified to being unable to see any one behind the tender. Lehr testified that when he went behind the tender he stooped under where the coupling was; that he was in a squatting position underneath the coupling. Photographs were taken from the motor house which show that the angle was such that the line of vision would be greatly obstructed by the wheels and the portions of the tender which hang low. Scott testified it was impossible for a man in the motor house to see a man crouched under the rear end of the tank on the other side of the turntable; that even where the drawhead is you could not see him. As the angle of vision would be downward, and the floor of the tank being about 4 feet from the ground, the wheels 36 or 38 inches high, making the axles half that height, and the brake shoes and beam as well as the sand board still lower, it is evident that it would be difficult to see any one behind the rear axle. In addition, one looking from a point 4 or 5 feet from the engine, to the rear of the tender, a distance of about 75 feet, would have an angle which would bring the wheels and all the other obstructions almost in a continuous line, to say the least. Upon the former trial of this case appellee was asked the following question:

"But when you stepped back from the southeast corner around to the east end and stooped down under the head of the engine, you were

not in sight of anybody up at the power house on the west end of the engine on the south side of it?" He answered: "There was nobody there."

He was then asked:

"But if there had been, you would not have been in sight of anybody there, would you?" His reply was: "I don't think they could see me."

Appellee in his brief contends this testimony was not inconsistent with that on this trial, because the question referred to "head of the engine," instead of the tender. This excuse is worse than none, for it is apparent, when the whole question is read, that it related to the very time when appellee had stooped under the coupler after stepping from the southeast corner of the tender, from which he looked to the motor house. This is also shown by his previous testimony, appearing on the preceding page of the transcript of the former testimony. On the former trial he testified, also, that the table was standing still while he was down, and just as he got up his foot caught; that just as he got up the table was turned; that he had raised himself; that he looked under there about ten seconds; that when he started to get out he said, "Let's go before it starts"; that he knew it was liable to be turned at any time.

[1] It is apparent that no theory of liability could be based upon the failure of appellant to send an employé to see that no one was behind the tender before moving the turntable, for the danger was very slight and easily guarded against. Nor did appellee ask that any such theory of liability be submitted. The evidence wholly fails to show that Scott had knowledge that appellee was inspecting the engine and tender, so we come down to the proposition whether the evidence warrants a finding that Scott, by the exercise of ordinary care, would have known of appellee's situation. What care should have been exercised, and did the failure to exercise it proximately cause appellee's injuries? He contends that appellant owed him the duty, pursuant to a custom to which he testified and which was supposed by appellant's witness Nuhn to exist, of having Scott look out of the glass-topped motor house, and, if he saw any one on the turntable, give warning by calling. Scott did not call, and it does not appear that he looked out. He does not testify that he did so, and his statement to appellee indicated he did not look. There is, however, an issue raised by appellant as to whether Scott could have seen appellee had he looked, and this became the vital issue in the case; for, if the failure to look was not the proximate cause

of appellee's injury, he cannot recover. Appellee testified that a man at the power house could see under the tender and see a man at the back end of the tender. He does not explain whether he ever made the experiment, or whether he is testifying to an opinion arrived at from the fact, as testified to by him, that when he went under the coupler he could see the power house and there was no one in it, so he turned, looked up, and saw the coupler. He was getting out from under the engine just as the turntable started; that he was standing in a slanting position. If his testimony can be taken to mean that in such position he was visible from the motor house, it is certainly, to say the least, flatly contradicted by that of Lehr and other witnesses. As the testimony shows that the turntable can be instantly moved by moving a lever, and as he himself testified Scott was not in the motor house within less than a minute previous to its being moved, it is evident that had Scott looked he would not have seen appellee unless he could see him as he was rising to his feet behind the tender. In view of the contradiction in appellee's own testimony, for which no explanation at all has been offered, and of the overwhelming preponderance of the testimony to the effect that he could not have seen, the verdict should not be permitted to stand. It also appears that appellee did not rely upon the custom, for he took no pains at all to see whether any one looking from the motor house would by the exercise of ordinary care be able to see him. If his statement on this trial is correct, he was relying on his being able to watch the motor house from under the tender, which he might do through a very narrow opening, and one through which it would be practically impossible to see him from the motor house.

[2] The appellant asked the court to instruct the jury that if they believed from the evidence that plaintiff, at the time of the happening of the alleged accident, was at such place and in such position that the operator of the turntable could not see him from the motor house, then he would not be entitled to recover. As the court had overruled appellant's request for a peremptory instruction, this charge should have been given. There was no evidence from which a jury could find that Scott in the exercise of ordinary care would have known that appellee was inspecting the engine, unless it be deduced from the fact that if he had looked according to custom, when he started to turn the lever, he would have seen appellee.

The judgment is reversed, and the cause remanded.